OPINION
Defendant-Appellant James M. Webb appeals his conviction on one count of possession of crack cocaine in the amount of not less than twenty-five nor more than one hundred grams in violation of R.C. § 2925.11(A), following his plea of no contest. Webb contends the trial court erred in overruling his motion to suppress certain evidence. Webb also claims error in the trial court's finding that he was not eligible to receive credit for the time he spent in jail prior to the court's termination entry.
Webb was arrested on September 9, 1998, in the vicinity of Meredith Street and Edgewood Avenue in Dayton, Montgomery County, Ohio. At approximately 1:30 that morning, Webb was the subject of a traffic stop effected by Officer Rodney Hughes of the Dayton Police Department after Hughes noticed that the rear license plate light on Webb's automobile was out. Webb was unable to provide a driver's license, automobile registration, or proof of insurance on Hughes' request, but did tell the officer his name and indicated he was the registered owner of the vehicle he was driving. During the conversation, and while Webb was still seated in the driver's seat of his vehicle, Hughes noticed what appeared to be the cap of a prescription drug container in Webb's shirt pocket. Seeking verification of Webb's identity, Hughes asked him if the container was his, and Webb answered that it was. Hughes asked to see the container and, while the parties dispute how many times the request was repeated, Webb ultimately handed it over to Hughes. The transparent container was without a label, however, which allowed Hughes to see a foil-wrapped object inside the bottle.
Since Hughes was aware that crack cocaine is transported in just such a fashion due to his many years as a police officer, he suspected the bottle contained contraband and asked Webb to step out of his car so he could conduct a pat-down search of Webb for weapons. Webb complied, and Hughes subsequently discovered a baggie containing more crack cocaine in Webb's right front pants pocket. At some point in the process, Hughes field tested the foil-wrapped contents of the prescription bottle and/or the substance retrieved from Webb's pants pocket, and the presence of crack cocaine was confirmed. Hughes handcuffed Webb, finished the pat-down search, placed Webb in the police cruiser, and advised him of his rights pursuant to Miranda v. Arizona (1966),384 U.S. 436. Thereafter, Webb unambiguously requested an attorney.
Shortly after Hughes' initial stop of Webb, another Dayton police officer patrolling the area, Ron Miller, pulled his cruiser behind that of Hughes to assist him. After Hughes had secured Webb in his patrol car, Hughes left him for approximately ten seconds to confer with Officer Miller. Upon Hughes' return to his own cruiser, Webb spontaneously blurted out that he had purchased twenty dollars worth of crack cocaine and had placed it in his pants pocket, which was presumably the same crack cocaine Hughes had located there. Hughes then questioned Webb about how long he had been using crack cocaine, where he had obtained the crack in his possession, and whether he would be willing to help in the investigation to follow. Webb never retracted his previous request for an attorney prior to Hughes' questioning of him.
Webb was indicted on one count of possession of crack cocaine on September 17, 1998. His motion to suppress use of all of the seized crack cocaine and the statements he made following his placement in Hughes' police cruiser followed approximately two weeks later. On October 30, a hearing was held in the Common Pleas Court of Montgomery County, at which Hughes and Webb testified.
In its decision, the trial court held as follows:
 The Court finds, on the facts found by the Court, that Defendant [Webb] voluntarily handed over the pill bottle to Officer Hughes. Defendant acted consensually and not pursuant to a show of authority. [Cite omitted.] Once Hughes looked at the bottle in search of a name to help identify Defendant (who had no identification), he saw foil wrapping inside the bottle. The officers then had probable cause to believe that the unlabeled bottle contained contraband.
Defendant was then arrested for possession of crack cocaine. A pat-down of Defendant, pursuant to a lawful arrest, was a valid search incident to arrest. More crack cocaine was found on Defendant's person.
Regarding Defendant's statement, Defendant's "blurted-out" statement about buying "a twenty" was a volunteered statement made by Defendant without officer questioning. There is no constitutional infirmity regarding that statement. However, regarding Defendant's answers to follow-up questions, when the officers knew Defendant had requested an attorney, the Court finds said statements to be defectively secured by the officers. There is no evidence that [D]efendant waived or revoked his Miranda rights or right to counsel once he requested an attorney. The Court OVERRULES Defendant's motion in part and SUSTAINS it in part. The Court hereby orders suppressed all statements made by Defendant other than his statement about buying "a twenty." Docket No. 11. at 2-3. Thereafter, on January 25, 1999, Webb pled no contest to the possession count and was sentenced to a mandatory term of three years in prison, a two year suspension of his driver's license, and a mandatory fine of $10,000. The termination entry filed on February 24, 1999, states that "[t]he defendant is NOT ELIGIBLE [to] receive credit for days spent in confinement." Docket No. 17 at 1. Webb now timely appeals the trial court's decision and order on his motion to suppress and the denial of jail time credit.
 I.
The trial court erred in overruling the motion to suppress.
In his first assignment of error, Webb claims the trial court erred in finding the prescription drug bottle and its contents admissible and argues that he only surrendered it to Officer Hughes in submission to Hughes' demand and show of authority.
We note that "the question whether a consent to search was in fact `voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Schneckloth v. Bustamonte
(1973) 412 U.S. 218, 227. Since the question of whether a particular defendant has consented to a search is one of fact and requires an assessment of the credibility of the evidence, it is a determination best made by the trier of fact. State v. Foster
(1993), 87 Ohio App.3d 32, 42; State v. Forrester (Feb. 6, 1998), Greene App. No. 97-CA-47, unreported, citing State v. Retherford
(1994), 93 Ohio App.3d 586, 592. Consequently, the trial court's determination on whether a consent to search was voluntary will not be disturbed on appeal unless it is clearly erroneous. Statev. Trumbull (Sept. 17, 1998), Franklin App. No. 97APA12-1661, unreported.
"It is settled law that where the validity of a search rests on consent, the state has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." Foster, supra at 41, citing Floridav. Royer (1983), 460 U.S. 491, Schneckloth, supra. Recently, we have employed the six-factor test used in United States v. Shabazz
(C.A.5, 1993), 993 F.2d 431, to assess the voluntary nature of consent. See State v. Sanchez (Apr. 24, 1998), Greene App. No. 97-CA-32, unreported; Forrester, supra. The six factors are as follows:
 The voluntariness of the defendant's custodial status;
The presence of coercive police procedures;
 The extent and level of the defendant's cooperation with the police;
 The defendant's awareness of his right to refuse to consent;
The defendant's education and intelligence; and
 The defendant's belief that no incriminating evidence will be found.
 Shabazz, supra at 438, quoting from United States v.Olivier-Becerril (C.A.5 1988), 861 F.2d 424, 426. It is important to note that no single factor is dispositive. Id.
In the present case, it is not disputed that Webb's detention was not voluntary, since it was the result of a lawful traffic stop. In addition, at the time Officer Hughes requested to see the prescription drug container, only the preliminaries involved in issuing a traffic citation had been conducted (e.g., requesting identification, registration, proof of insurance), and Webb's continued detention for completion of the citation was a given. Thus, Webb's custodial status was not voluntary.
The second factor, the one Webb relies upon in his argument, requires a determination as to whether coercive police procedures were used to obtain consent to the search. At the suppression hearing on his motion, Webb testified that after Officer Hughes asked him what was in his shirt pocket and Webb stated it was a pill bottle, Hughes repeatedly told Webb he needed to see the bottle to determine whether it belonged to Webb. There is no suggestion in the record that Hughes threatened to obtain a search warrant, or in any other way communicated to Webb that his failure to turn over the container would have negative consequences for Webb. Nevertheless, Webb stated that he only handed the container to Hughes because he thought Hughes would take it anyway, and because of Hughes' insistence that he do so. Officer Hughes also testified at the hearing, stating that he asked for the bottle only once for the purpose of verifying Webb's identity since Webb produced no more ordinary form of identification. The trial court, as the trier of fact, found Officer Hughes' testimony the more credible, as is apparent from the court's factual finding that "Hughes asked to see the bottle to check for a name thereon to help identify Defendant's identity. Defendant reached into his pocket and handed the bottle to Hughes." Docket No. 11 at 2. We defer to the trial court's findings of fact as it is in the best position to assess the credibility of the witnesses. Hence, we find that Officer Hughes employed no coercive police procedures in obtaining Webb's consent to search the pill bottle.
The third factor concerns the extent to which Webb was cooperating with the police. The testimony from both witnesses at the suppression hearing indicates that Webb was at all times, cooperative with the police.
Fourth, we consider whether Webb was aware of his right to refuse to consent to Officer Hughes' request to examine the prescription bottle. Although the question was never posed to Webb at the suppression hearing, there is some indication that he knew he did not have to honor Officer Hughes' request to see the bottle. Specifically, Webb testified that Officer Hughes "said — he asked me again, `Well, I need to * * * know if that pill bottle belong[s] to you.' But he didn't — he did not." Tr. at 61. From this testimony it is possible to conclude that Webb was aware of his right to refuse to consent to Hughes' search of the pill bottle.
The fifth factor concerns the extent of Webb's education and his level of intelligence. No testimony was presented at the suppression hearing on these matters. At Webb's subsequent Crim.R. 11 hearing, however, he stated he had left school at the age of thirteen, which suggests he has approximately an eighth grade education. Tr. at 95. Webb also indicated he was literate and had no trouble reading or writing. Id. In addition, nothing in the record before us suggests Webb possesses anything less than average intelligence. Thus, it is unlikely Webb's level of education and intelligence caused his consent for Officer Hughes to search the pill bottle to be anything but voluntary.
Finally, we consider whether Webb believed that no incriminating evidence would be found as a result of his consent to search the prescription bottle. Webb was undoubtedly aware that the pill bottle contained contraband, and that, since the bottle was transparent, Officer Hughes would discover the contents in due time after Webb's consent was given.
In sum, we find two of the factors, namely, Webb's involuntary custodial status and his knowledge that the crack cocaine would be discovered if he turned the pill bottle over to Officer Hughes, may indicate Webb's consent to search the bottle was involuntary. The remaining four factors, however, are sufficient to overcome the implication of the former two. Consequently, we conclude that the trial court's determination that Webb's consent was voluntary and not in submission to a show of lawful authority is supported by the record. Having found no error, we overrule Webb's first assignment of error.
 II.
The trial court erred in finding Appellant ineligible for jail time credit.
 In his second assignment of error, Webb claims he was improperly denied jail time credit, citing State v. Herd (Mar. 31, 1999), Montgomery App. No. 17385, unreported, in support. The State concedes that Webb should have been given jail time credit for any days spent in confinement after his arrest and before his conviction. While we agree that the trial court erred by including in the termination entry a statement that Webb is ineligible for jail time credit, we find it necessary to elaborate on our reasons for reaching that conclusion.
 Webb bases his argument on Herd, supra, a recent case from this court, wherein we found R.C. § 2929.13(F) unconstitutional on equal protection grounds. That statute prohibits a sentencing court from reducing the term of a sentence it imposes for certain crimes, including the one of which Herd was convicted, notwithstanding the provisions of R.C. Chapter 2967. On the State's motion for reconsideration, however, we recognized that our decision in Herd was in error. State v. Herd (May 5, 1999), Montgomery App. No. 17385, unreported (decision and entry). Therein, we relied upon State v. Day
(Oct. 2, 1998), Montgomery App. No. 16902, unreported, and State v. Reichelderfer (Apr. 30, 1999), Montgomery App. No. 17445, unreported. In Day, we discussed the relationship between R.C. § 2929.13(F) and R.C. § 2967.191[1], stating as follows:
 R.C. 2929.13(F) was adopted as part of the comprehensive changes enacted by Am.Sub.S.B. 2. One of the objectives of that legislation was "truth in sentencing," which sought to require prisoners to serve the full time to which they were sentenced, or at least to avoid their early release for certain reasons. The General Assembly apparently believed that the power of the courts to grant credit for pretrial "dead time" was deserving of constraint for that reason.
Nevertheless, the right of which Days [sic] complains he was denied the protections afforded to others is conferred by R.C.2967.191, which remains unaffected by Am.Sub.S.B. 2. Even though some courts formerly granted a "credit" for time served in their sentencing entries, the benefit was actually conferred by the department of rehabilitation and correction after incarceration commenced. That remains the procedure applicable to the benefit that R.C. 2967.191 allows, the prohibitions of R.C. 2929.13(F) notwithstanding. Courts may not "grant" credit for dead time, but they are requested by the department to state the amount of that time in their sentencing entries for the department's later use in reducing the defendant's term of incarceration on the basis of "dead time" pursuant to R.C. 2967.191. See Ohio Adm. Code5120-2-04. The same result obtains.
We followed Day in Reichelderfer, supra, and broadened our discussion to address the recent amendment to Crim.R. 32.2 as it relates to a sentencing court's grant and calculation of jail time credit, stating as follows:
 [A]lthough the trial court is precluded from reducing the term of imprisonment for * * * [certain] offenses, pursuant to R.C. 2929.13(F), the Department of Rehabilitation and Correction is nevertheless required to reduce the stated prison term to reflect pre-sentence incarceration, pursuant to R.C. 2967.191. Although an argument could be made that the restriction in R.C. 2929.13(F) barring a trial court from reducing a term of imprisonment pursuant to "any other provision of Chapter 2967," is broad enough to encompass the reduction required to be made by the Department of Rehabilitation and Correction in R.C. 2967.191, that would be of questionable constitutionality * * *. Consequently, the better construction of R.C. 2929.13(F) is that it merely bars a trial court from making a reduction to reflect pre-sentence incarceration.
Formerly, trial courts were required by Crim.R. 32.2 to recite, in the termination entry, the amount of time that a convicted defendant spent incarcerated before sentencing. However, Crim.R. 32.2 was amended, effective July 1, 1998, and no longer contains this requirement. The Department of Rehabilitation and Corrections understandably would appreciate a trial court's recitation, in its termination entry, of the amount of time that a convicted defendant has spent in jail upon the charge for which he was convicted, so that the Department may perform its duty pursuant to R.C. 2967.191. See Ohio Adm. Code 5120-2-04(B), which purports to require the sentencing court to do so. Although we cannot say that a trial court is required by law to recite the amount of pre-sentence jail time in its termination entry, that is, in our view, clearly the better practice.
In the case before us, the termination entry is not silent on the subject of jail time credit. To the contrary, it contains the following provision:
The defendant is to receive credit for the following: (NOTENTITLED TO JAIL TIME CREDIT) days spent in confinement;
This provision is legally erroneous. If, as the State appears to concede, Reichelderfer was incarcerated, before sentencing, upon the charge for which he was convicted, he is entitled, pursuant to R.C. 2967.191, to credit for that time, even though it is the Department of Rehabilitation and Correction that is to apply the credit. Furthermore, this error is prejudicial because it would appear to bind both Reichelderfer and the State, both of whom are parties to the judgment entry.
We agree with Reichelderfer that the trial court erred by providing, in the termination entry, that he is not entitled to jail time credit.
 In Reichelderfer, we reversed the trial court's judgment and remanded for resentencing with an order that the trial court delete from the termination entry the provision specifying that Reichelderfer was not entitled to jail time credit. Nevertheless, we noted that the trial court was permitted, at its discretion, to calculate the amount of pre-sentence time Reichelderfer spent in jail on the charges for which he was ultimately convicted, and recite that time in its termination entry.
We conclude that our reasoning in Day and Reichelderfer is applicable with equal force to the instant case. Accordingly, Webb's second assignment of error is sustained.
We have found Webb's first assignment of error to be without merit. His second assignment of error is sustained, however, and we consequently reverse the trial court's judgment to that extent and remand for resentencing with an order that the trial court delete the provision in its termination entry stating that Webb is not eligible to receive credit for any pre-sentence time spent in confinement. In its discretion, the trial court may calculate and recite the amount of pre-sentence time Webb spent in jail on the relevant possession charge. Accordingly, the judgment of the trial court is affirmed in part, reversed in part, and remanded for further proceedings not inconsistent with this opinion.
GRADY, P.J. and WOLFF, J., concur.
Copies mailed to:
Kirsten A. Davies
Victor A. Hodge
Hon. David A. Gowdown
[1] In pertinent part, R.C. § 2967.191 provides that "[t]he department of rehabilitation and correction shall reduce the stated prison term of a prisoner * * * by the total number of days that the prisoner was confined for any reason arising out of the offense for which the prisoner was convicted and sentenced, including confinement in lieu of bail while awaiting trial * * *."